UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

In re:                                          Chapter 11 Case

FRANCIS SETH GRIFFITH,                          Case No.: 12-35826-RBR

          Debtor.
_____/

## MOTION TO VALUE AND DETERMINE SECURED STATUS OF LIEN
## ON REAL PROPERTY

### IMPORTANT NOTICE TO CREDITORS:
### THIS IS A MOTION TO VALUE YOUR COLLATERAL

**This Motion seeks to value collateral described below securing the claim of the creditor listed below.**

---

**IF YOU DISPUTE THE VALUE ALLEGED OR TREATMENT OF YOUR CLAIM PROPOSED IN THIS MOTION, YOU MUST FILE A WRITTEN OBJECTION NO LATER THAN TWO BUSINESS DAYS PRIOR TO THE SCHEDULED HEARING [SEE LOCAL RULE 3015-3(A)(2)]**

**If you have not filed a proof of claim, you have until the later of the claims bar date or 21 days from the date this Motion was served upon you to file a proof of claim or you will be deemed to have waived the right to payment of any unsecured claim to which you might otherwise be entitled. [See Local Rule 3015-3(A)(4)]**

1.      The Debtor files this Motion to Value Collateral pursuant to 11 U.S.C. §506(a), Bankruptcy Rule 3012, Local Rule 3015-3 and seeks to value real property securing the claim of CitiMortgage, Inc., ("Lender"). Lender holds a second mortgage recorded at OR Book 41091, Page 1730 in the official records of Broward County, Florida.

2.      The real property is located at 321 S.W. 99th Avenue, Pembroke Pines, Florida 33025, and is more particularly described as follows:

**SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.** *See* Exhibit "A".

3.    The value of the real property is $170,000.00 at the time of filing as determined by an appraisal of the property performed on November 6, 2012.  See Exhibit "B".

4.    U.S. Bank, N.A., holds a first mortgage on the real property in the amount of $350,000.00.  *See* Exhibit "C".  The subject property is Debtor's investment property.

5.  Lender's collateral is not solely the Debtor's principal residence. After payment in full of the claims secured by liens senior to that of Lender, there is equity of $0.00 remaining in the real property. Accordingly, the value of Lender's secured interest in the real property is $0.00 and the value of the Lender's unsecured, deficiency claim is $30,000.00.

6.    The undersigned has reviewed the docket and claims register and states (select only one):
          __X__Lender has not filed a Proof of Claim.  Therefore the trustee shall not disburse any payments to Lender unless a Proof of Claim is timely filed. In the event a Proof of Claim is timely filed, it shall be classified as a general unsecured claim regardless of the original classification in the Proof of Claim as filed.

or
          _____Lender filed a proof of claim in this case.  It shall be classified as a secured claim to the extent provided in paragraph 5, above, and as a general unsecured claim for any deficiency, regardless of the original classification in the proof of claim.

7.    The subject property may not be sold or refinanced without proper notice and further order of the court.

    **WHEREFORE,** the Debtors respectfully requests an order of the Court (a) determining the value of the real property in the amount asserted in this Motion, (b) determining the secured status of the Lender's lien as stated above, (c) determining that any timely filed proof of claim is classified as stated above, (d) if Lender's secured interest in the real property is determined to be $0, deeming Lender's mortgage on the real property void and extinguished automatically, without further order of the Court, upon entry of the debtor's discharge in this chapter 13 case, and (e) providing such other and further relief as is just.

## NOTICE IS HEREBY GIVEN THAT:

1.    In accordance with the rules of this Court, unless an objection is filed with the Court and served upon the debtor, the debtor's attorney, and the trustee at least two (2) business days prior to the hearing scheduled on this Motion, the value of the collateral may be established at the amount stated above without further notice, hearing or order of the Court. Pursuant to Local Rule 3015-3, timely raised objections will be heard at the hearing scheduled on the Motion.

2.   The undersigned acknowledges that this Motion and the notice of hearing thereon must be served pursuant to Bankruptcy Rule 7004 and Local Rule 3015-3 at least 21 days prior to the hearing date and that a certificate of service must be filed when the Motion and notice of hearing thereon are served.

**CERTIFICATE OF ADMISSION AND SERVICE**

I **HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090A.

I **HEREBY FURTHER CERTIFY** that a true copy of the foregoing was furnished by the was furnished by the Court's ECF electronic mail to United States Trustee 51 S.W. 1st Ave., Suite 1204, Miami, Florida 33130, and by certified mail return receipt requested to Sanjiv Das, President/CEO, CitiMortgage, Inc., 399 Park Avenue, New York, NY 10022 on November 30, 2012.

> Law Offices of C. Marie Brevitt-Schoop, P.A.
> Attorney for Debtor
> 20401 NW 2nd Avenue, Suite 220
> Miami, Florida 33169
> (305)653-6959
> (305)653-6442
>
>
> By: /s/ C. Marie Brevitt-Schoop
>    C.Marie Brevitt-Schoop, Esq.
>    Florida Bar No.: 0125458

**SERVICE LIST**

Sanjiv Das, President
CitiMortgage, Inc.
399 Park Avenue
New York, N.Y. 10022

Via Certified Mail Return Receipt Requested, Receipt No: 7011 2000 0002 5774 4978

EXHIBIT "A"

\

THIS INSTRUMENT PREPARED BY AND RETURN TO:
**HOWARD S. GAINES, ESQ.**

YOUR TITLE CHOICE, INC.
6261 NW 6 WAY, SUITE 201
FT. LAUDERDALE, FL 33309

Property Appraisers Parcel Identification (Folio) Numbers:
**1177-24-063**

——————————————— SPACE ABOVE THIS LINE FOR RECORDING DATA ————————————————

**THIS WARRANTY DEED,** made the 5th day of December, A.D. 2005 by **BAYO OLAOYE and OLATOKUNBO OLAOYE, HUSBAND AND WIFE,** herein called the grantors, to **FRANCIS GRIFFITH, A SINGLE PERSON** whose post office address is **321 SW 99 AVE, PEMBROKE PINES, FL 33025,** hereinafter called the Grantee:
(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

**W I T N E S S E T H :** That the grantors, for and in consideration of the sum of TEN AND 00/100'S ($10.00) Dollars and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee all that certain land situate in BROWARD County, State of Florida, viz:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Subject to easements, restrictions and reservations of record and to taxes for the year 2006 and thereafter.

**TOGETHER,** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**TO HAVE AND TO HOLD,** the same in fee simple forever.

**AND,** the grantors hereby covenant with said grantee that the grantors are lawfully seized of said land in fee simple; that the grantors have good right and lawful authority to sell and convey said land, and hereby warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances, except taxes accruing subsequent to December 31, 2003.

**IN WITNESS WHEREOF,** the said grantors have signed and sealed these presents the day and year first above written.

Signed, sealed and delivered in the presence of:

_____
Witness #1 Signature
B. PAULETTE HILSMAN
Witness #1 Printed Name

_____
Witness #2 Signature
LINDA LOPEZ
Witness #2 Printed Name

_____ L.S.
**BAYO OLAOYE**
321 SW 99 AVE, PEMBROKE PINES, FL 33025

_____ L.S.
**OLATOKUNBO OLAOYE**
321 SW 99 AVE, PEMBROKE PINES, FL 33025

**STATE OF FLORIDA**
**COUNTY OF BROWARD**

The foregoing instrument was acknowledged before me this **5th** day of **December, 2005** by **BAYO OLAOYE and OLATOKUNBO OLAOYE** who are personally known to me or have produced _FLORIDA DRIVERS LICENSE_ as identification.

SEAL    B. Paulette Hilsman
Commission #DD312376
Expires: Apr 20, 2008
Bonded Thru
Atlantic Bonding Co., Inc

My Commission Expires: 4/20/08

FILE # 05-2955

_____
Notary Signature
B. PAULETTE HILSMAN
Printed Notary Signature

**WILL CALL**
**YOUR TITLE CHOICE, INC**
**BOX #129**

(2)

Lot 63, of GARDEN LAKE AT PEMBROKE PINES, also known as that part of Tract "A" of TANGLEWOOD TOWNHOUSES, as recorded in Plat Book 117, at Page 43, of the Public Records of Broward County, Florida, more particularly described as follows:

Commence at the Southwest corner of said Tract "A", thence North 00° 01' 13" East along the West line of said Tract; thence North 89° 53' 38" East along on said Plat for 520.37 feet to the Northwest corner of said Tract; thence North 89° 53' 38" East along the North line of said tract for 358.01 feet; thence South 00° 06' 20" East for 236.16 feet to the Point of Beginning; thence South 89° 53' 40" West for 91.46 feet; thence South 15° 37' 49" East for 43.28 feet to the Point of Tangency; thence along a circular curve concave to the Northeast having for its elements a delta angle of 74° 23' 12" a radius of 27.50 feet, for an arc distance of 35.74 feet; thence North 89° 53' 40" East for 53.38 feet; thence North 00° 06' 20" West for 61.85 feet to the Point of Beginning.

EXHIBIT "B"

A&F APPRAISAL SERVICES

File No. AM5505

# APPRAISAL OF



## LOCATED AT:

321 SW 99 AVE
PEMBROKE PINES

## FOR:

FRANCIS GRIFFITH
321 SW 99 AVE
PEMBROKE PINES, FL 33025

## BORROWER:

N/A

## AS OF:

November 6, 2012

## BY:

ANDREW S MELTZER CERT RES. RD3190

A&F APPRAISAL SERVICES

File No. AM5505

FRANCIS GRIFFITH
321 SW 99 AVE
PEMBROKE PINES, FL  33025

File Number:  AM5505

In accordance with your request, I have appraised the real property at:

321 SW 99 AVE
PEMBROKE PINES

The purpose of this appraisal is to develop an opinion of the market value of the subject property, as improved.
The property rights appraised are the fee simple interest in the site and improvements.

In my opinion, the market value of the property as of   November 6, 2012                          is:

$170,000
One Hundred Seventy Thousand  Dollars

The attached report contains the description, analysis and supportive data for the conclusions,
final opinion of value, descriptive photographs, limiting conditions and appropriate certifications.

ANDREW S MELTZER CERT.RES. RD3190

A & F APPRAISAL SERVICES

# Uniform Residential Appraisal Report

File No. AM5505

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

**SUBJECT**

| | | |
|---|---|---|
| Property Address 321 SW 99 AVE | City PEMBROKE PINES | State FL Zip Code 33025 |
| Borrower N/A | Owner of Public Record FRANCIS GRIFFITH | County BROWARD |

Legal Description See Attached Addendum

| | | |
|---|---|---|
| Assessor's Parcel # 51-41-17-24-0630 | Tax Year 2011 | R.E. Taxes $ 3,192 |
| Neighborhood Name TANGLEWOOD TOWNHOMES | Map Reference 51-41-17 | Census Tract 1103.40 |

Occupant [X] Owner [ ] Tenant [ ] Vacant   Special Assessments $ 0   [X] PUD   HOA $ 55   [ ] per year [X] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) ASCERTAIN MARKET VALUE

Lender/Client FRANCIS GRIFFITH   Address 321 SW 99 AVE, PEMBROKE PINES, FL 33025

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s).   DATA SOURCE: MARMLS

**CONTRACT**

[ ] I did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ ___   Date of Contract ___   Is the property seller the owner of public record? [ ] Yes [ ] No   Data Source(s) ___

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | | | Property Values [ ] Increasing [X] Stable [ ] Declining | | | PRICE $(000) | AGE (yrs) | One-Unit | 70 % |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | | | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | | | 5(000) Low 125 | 0 | 2-4 Unit | 0 % |
| Growth [ ] Rapid [X] Stable [ ] Slow | | | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | | | 125 Low 0 | | Multi-Family | 20 % |
| | | | | | | 300 High 45 | | Commercial | 8 % |
| | | | | | | 200 Pred 30 | | Other VCNT | 2 % |

Neighborhood Boundaries THE NEIGHBORHOOD IS LOCATED SOUTH OF PINES BLVD, NORTH OF PEMBROKE RD, EAST OF PALM AVE, AND WEST OF S DOUGLAS RD.

Neighborhood Description ALL TYPICAL RESIDENTIAL AMENITIES ARE LOCATED WITHIN CLOSE PROXIMITY INCLUDING SCHOOLS, PLACES OF WORSHIP, SHOPPING FACILITIES AND TRANSPORTATION.

Market Conditions (including support for the above conclusions) TYPICAL FINANCING IN THE SUBJECT'S MARKET AREA INCLUDES CONVENTIONAL LOANS, FHA, VA WITH SOME SELLER FINANCING. PROPERTY VALUES ARE STABLE IN THE SUBJECT'S MARKET. DEMAND AND SUPPLY ARE IN BALANCE AND TYPICAL MARKETING TIME IS AVERAGING AT 3-6 MONTHS.

**SITE**

| | | |
|---|---|---|
| Dimensions UNKN (SURVEY NOT PROVIDED) | Area 5042 sf | Shape IRREGULAR   View RESIDENTIAL |

Specific Zoning Classification R-4   Zoning Description SINGLE FAMILY REIDENTIAL

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No   If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street ASPHALT | [X] | |
| Gas | | NONE | Sanitary Sewer | [X] | | Alley NONE | | |

FEMA Special Flood Hazard Area [X] Yes [ ] No   FEMA Flood Zone AH   FEMA Map # 12011C0315F   FEMA Map Date 08/18/1992

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No   If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No   If Yes, describe.

**IMPROVEMENTS**

| GENERAL DESCRIPTION | | FOUNDATION | | EXTERIOR DESCRIPTION materials/condition | | INTERIOR materials/condition | |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | | [X] Concrete Slab [ ] Crawl Space | | Foundation Walls CONCRETE/AVG | | Floors MRBL&CPT/AV-GD | |
| # of Stories 2 | | [ ] Full Basement [ ] Partial Basement | | Exterior Walls CBS/AVG | | Walls DRYWALL/AVG | |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | | Basement Area 0 sq. ft. | | Roof Surface TILE/AVG | | Trim/Finish WOOD/AG | |
| [X] Existing [ ] Proposed [ ] Under Const. | | Basement Finish 0 % | | Gutters & Downspouts NONE | | Bath Floor TILE/AVG | |
| Design (Style) 2 STORY | | [ ] Outside Entry/Exit [ ] Sump Pump | | Window Type S HUNG/AVG | | Bath Wainscot TILE/AVG | |
| Year Built 1994 | | Evidence of [ ] Infestation | | Storm Sash/Insulated NONE | | Car Storage [ ] None | |
| Effective Age (Yrs) 12 | | [ ] Dampness [ ] Settlement | | Screens NONE | | [X] Driveway # of Cars 4 | |
| Attic [ ] None | | Heating [X] FWA [ ] HWBB [ ] Radiant | | Amenities | | Driveway Surface ASPHALT | |
| [ ] Drop Stair [ ] Stairs | | [ ] Other Fuel ELEC | | [ ] Fireplace(s) # 0 [X] Fence Wood | | [X] Garage # of Cars 2 | |
| [ ] Floor [X] Scuttle | | Cooling [X] Central Air Conditioning | | [X] Patio/Deck Open [X] Porch Cvrd | | [ ] Carport # of Cars 0 | |
| [ ] Finished [ ] Heated | | [ ] Individual [ ] Other | | [ ] Pool [ ] Other | | [ ] Att. [ ] Det. [X] Built-in | |

Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave [X] Washer/Dryer [ ] Other (describe)

Finished area above grade contains:   7 Rooms   3 Bedrooms   2.5 Bath(s)   1,690 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.). NO ADDITIONAL FEATURES OR ENERGY EFFICIENT ITEMS WERE NOTED AT THE TIME OF THE INSPECTION.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). THE SUBJECT IS IN AVERAGE TO GOOD CONDITION. THE PROPERTY HAS BEEN UPDATED WITH MARBLE FLOORING AND UPDATED HALF BATHROOM.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No   If Yes, describe.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No   If No, describe.

## Uniform Residential Appraisal Report

File No. AM5505

There are __5__ comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 185,000 to $ 240,000.

There are __24__ comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 155,000 to $ 250,000.

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 321 SW 99 AVE PEMBROKE PINES, FL 33025 | 250 SW 98 TERR PEMBROKE PINES, FL 33025 | | 9840 SW 3 ST PEMBROKE PINES, FL 33025 | | 300 SW 100 AVE PEMBROKE PINES, FL 33025 | |
| Proximity to Subject | | 0.07 miles NNE | | 0.04 miles E | | 0.10 miles W | |
| Sale Price | $ | | 185,000 | | 195,700 | | 162,500 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 88.43 sq. ft. | | $ 115.39 sq. ft. | | $ 95.81 sq. ft. | |
| Data Source(s) | | MAR MLS #H899290;DOM 7 | | MAR MLS #A1584722;DOM 200 | | MAR MLS #F1180862;DOM 160 | |
| Verification Source(s) | | BCPA,NET/REALIST | | BCPA,NET/REALIST | | BCPA,NET/REALIST | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | FHA SELLER CONC. | -5,500 | CASH NONE NOTED | | CASH NONE NOTED | |
| Date of Sale/Time | | 09/18/2012 | | 08/29/2012 | | 10/16/2012 | |
| Location | SUBURBAN | SUBURBAN | | SUBURBAN | | SUBURBAN | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 5042 sf | 4346 sf | | 5221 sf | | 4324 sf | |
| View | RESIDENTIAL | RESIDENTIAL | | LAKE | -19,000 | RESIDENTIAL | |
| Design (Style) | 2 STORY | 2 STORY | | 2 STORY | | 2 STORY | |
| Quality of Construction | CBS/AVG | CBS/AVG | | CBS/AVG | | CBS/AVG | |
| Actual Age | 18 | 18 | | 18 | | 18 | |
| Condition | AVG/GOOD | AVG/GOOD | | AVG/GOOD | | AVERAGE | 5,000 |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 7 3 2.5 | 7 3 2.5 | | 8 4 2.5 | | 8 4 2.5 | |
| Gross Living Area | 1,690 sq. ft. | 2,092 sq. ft. | -16,080 | 1,696 sq. ft. | 0 | 1,696 sq. ft. | 0 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | CENTRAL A/C | CENTRAL A/C | | CENTRAL A/C | | CENTRAL A/C | |
| Energy Efficient Items | NONE | NONE | | NONE | | NONE | |
| Garage/Carport | GARAGE: 2 | GARAGE: 2 | | GARAGE: 2 | | GARAGE: 2 | |
| Porch/Patio/Deck | PORCH/PATIO | PORCH/PATIO | | PORCH/PATIO | | PORCH/PATIO | |
| Net Adjustment (Total) | | [ ] + [X] - $ | 21,580 | [ ] + [X] - $ | 19,000 | [X] + [ ] - $ | 5,000 |
| Adjusted Sale Price of Comparables | | Net Adj. -11.7% Gross Adj. 11.7% $ | 163,420 | Net Adj. -9.7% Gross Adj. 9.7% $ | 176,700 | Net Adj. 3.1% Gross Adj. 3.1% $ | 167,500 |

[X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) REALIST/BCPA.NET/IMAPP

My research [X] did [ ] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) REALIST/BCPA.NET/IMAPP

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | 02/14/2012 |
| Price of Prior Sale/Transfer | | | | CERT OF TITLE (FRCLSR) |
| Data Source(s) | REALIST/IMAPP | REALIST/IMAPP | REALIST/IMAPP | REALIST/IMAPP |
| Effective Date of Data Source(s) | 11/06/2012 | 11/06/2012 | 11/06/2012 | 11/06/2012 |

Analysis of prior sale or transfer history of the subject property and comparable sales.

Summary of Sales Comparison Approach. THESE SALES WERE SELECTED FROM ALL AVAILABLE MARKET DATA, VERIFIED AND INSPECTED BY THE APPRAISER. ALL SALES ARE CLOSED TRANSACTIONS. THESE SALES ARE SIMILAR TO THE SUBJECT CONSIDERING ALL ELEMENTS OF COMPARISON INCLUDING DATE OF SALE, CONDITIONS SURROUNDING THE SALE, LOCATION OF THE PROPERTY AND PHYSICAL CHARACTERISTICS AS TO SIZE OF THE DWELLING.

Indicated Value by Sales Comparison Approach $ 170,000

Indicated Value by: Sales Comparison Approach $ 170,000  Cost Approach (if developed) $ 188,200  Income Approach (if developed) $
GREATEST WEIGHT PLACED ON ADJUSTED SALES #1, 2, AND 3 AS THEY ARE THE MOST RECENT SALES IN THE SUBJECTS SUBDIVISION.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 170,000

as of 11/06/2012, which is the date of inspection and the effective date of this appraisal.

THANK YOU VERY MUCH

A & F APPRAISAL SERVICES

## Uniform Residential Appraisal Report

File No. AM5505

| | |
|---|---|
| **ADDITIONAL COMMENTS** | THESE COMPARABLE SALES WERE SELECTED FROM THE SUBJECTS MARKET (AREA OR PROJECT) AS THE MOST SIMILAR AVAILABLE REFLECTING THE ACTIONS OF BUYERS & SELLERS IN THE RECENT PAST. EQUAL CONSIDERATION WAS GIVEN TO ALL COMPARABLE CLOSED SALES WHEN ARRIVING AT A MARKET VALUE ESTIMATE. |
| | THE PREDOMINANT SALES PRICE IS THAT PRICE WHICH IS (MOST OFTEN FOUND) AFTER DISREGARDING ISOLATED EXTREMES AT EITHER END OF THE PRICE SPECTRUM. THE ESTIMATED MARKET VALUE FOR THE SUBJECT IS NOT PREDOMINANT VALUE OF THE NEIGHBORHOOD. THIS DOES NOT HAVE AN ADVERSE AFFECT ON THE SUBJECT'S MARKET VALUE. IN THE SUBJECT'S CASE THE MARKET VALUE FALLS WELL WITHIN THE HIGH LOW PRICE PARAMETERS OF THE NEIGHBORHOOD. THIS INDICATES THE SUBJECT IS CHARACTERISTIC AND REPRESENTATIVE OF SIMILAR PROPERTIES IN THE NEIGHBORHOOD. |

**COST APPROACH TO VALUE** (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value.) **HIGH LAND TO VALUE RATIOS ARE TYPICAL TO THE SUBJECT'S MARKET SEGMENT DUE TO THE LIMITED AVAILABILITY OF BUILDABLE LOTS. SITE VALUE IS DERIVED THROUGH LAND SALES AND ABSTRACTION FROM IMPROVED SALES.**

| | | |
|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE .................... = $ | 30,000 |
| Source of cost data Marshall & Swift - Local Area Contractors | Dwelling 1,690 Sq. Ft. @ $ 100.00 ..... = $ | 169,000 |
| Quality rating from cost service AVG Effective date of cost data 07/01/2012 | Sq. Ft. @ $ ..... = $ | 0 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | PORCH/PATIO | 5,000 |
| COST ESTIMATES DERIVED FROM MARSHALL & SWIFT | Garage/Carport 400 Sq. Ft. @ $ 50.00 ..... = $ | 20,000 |
| COST SERVICE. SITE VALUE DERIVED FROM MARKET | Total Estimate of Cost-New ..... = $ | 194,000 |
| ABSTRACTION AND FROM LAND SALES. THE LAND TO | Less 85 Physical Functional External | |
| VALUE RATIO IS TYPICAL FOR THE AREA. SEE ATTACHED | Depreciation $35,815 ..... = $( | 35,815) |
| SKETCH FOR FLOORPLAN AND AREA CALCULATIONS. | Depreciated Cost of Improvements ..... = $ | 158,185 |
| ** NOT TO BE USED FOR INSURANCE PURPOSES** | "As-is" Value of Site Improvements ..... = $ | |
| Estimated Remaining Economic Life (HUD and VA only) 53 Years | INDICATED VALUE BY COST APPROACH ..... = $ | 188,200 |

**INCOME APPROACH TO VALUE** (not required by Fannie Mae)

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM) **The Income approach was not used or required on this report.** | | | |

**PROJECT INFORMATION FOR PUDs (if applicable)**

| | |
|---|---|
| Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☒ No Unit type(s) ☒ Detached ☐ Attached | |
| Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit. | |
| Legal name of project | |
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |
| Was the project created by the conversion of an existing building(s) into a PUD? ☐ Yes ☐ No If Yes, date of conversion. | |
| Does the project contain any multi-dwelling units? ☐ Yes ☐ No Data source(s) | |
| Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No If No, describe the status of completion. | |
| Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No If Yes, describe the rental terms and options. | |
| Describe common elements and recreational facilities | |

A & F APPRAISAL SERVICES

## Uniform Residential Appraisal Report     File No. AM5505

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.   The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.   The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3.   The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.   The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5.   The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6.   The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

A & F APPRAISAL SERVICES

## Uniform Residential Appraisal Report

File No. AM5505

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.  I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2.  I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3.  I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4.  I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5.  I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6.  I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7.  I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8.  I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9.  I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10.  I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11.  I have knowledge and experience in appraising this type of property in this market area.

12.  I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13.  I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14.  I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15.  I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16.  I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17.  I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18.  My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19.  I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20.  I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

A & F APPRAISAL SERVICES

## Uniform Residential Appraisal Report

File No. AM5505

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1.   I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2.   I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.   The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.   This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5.   If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name ANDREW S MELTZER CERT.RES. RD3190 | Name |
| Company Name A & F APPRAISAL SERVICES | Company Name |
| Company Address 3550 BISCAYNE BLVD SUITE 312 | Company Address |
| MIAMI, FL 33137 | |
| Telephone Number (305) 573-1577 | Telephone Number |
| Email Address MELTZ777@GMAIL.COM | Email Address |
| Date of Signature and Report 11/09/2012 | Date of Signature |
| Effective Date of Appraisal 11/06/2012 | State Certification # |
| State Certification # RD3190 | or State License # |
| or State License # | State |
| or Other (describe) _____ State # | Expiration Date of Certification or License |
| State FL | |
| Expiration Date of Certification or License 11/30/2014 | |
| | |
| ADDRESS OF PROPERTY APPRAISED | SUBJECT PROPERTY |
| 321 SW 99 AVE | ☐ Did not inspect subject property |
| PEMBROKE PINES, FL 33025 | ☐ Did inspect exterior of subject property from street |
| | Date of Inspection |
| APPRAISED VALUE OF SUBJECT PROPERTY $ 170,000 | ☐ Did inspect interior and exterior of subject property |
| | Date of Inspection |
| LENDER/CLIENT | |
| Name | COMPARABLE SALES |
| Company Name FRANCIS GRIFFITH | ☐ Did not inspect exterior of comparable sales from street |
| Company Address 321 SW 99 AVE | ☐ Did inspect exterior of comparable sales from street |
| PEMBROKE PINES, FL 33025 | Date of Inspection |
| Email Address | |

THANK YOU VERY MUCH

A & F APPRAISAL SERVICES

## Uniform Residential Appraisal Report

File No. AM5505

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| | 321 SW 99 AVE | 9570 SW 7 CT | | 820 SW 95 TERR | | 311 SW 100 TERR | |
| Address PEMBROKE PINES, FL 33025 | | PEMBROKE PINES, FL 33025 | | PEMBROKE PINES, FL 33025 | | PEMBROKE PINES, FL 33025 | |
| Proximity to Subject | | 0.31 miles SE | | 0.25 miles SSE | | 0.12 miles W | |
| Sale Price | $ | | $ 224,500 | | $ 210,000 | | $ 232,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 135.65 sq. ft. | | $ 134.36 sq. ft. | | $ 148.91 sq. ft. | |
| Data Source(s) | | MAR MLS #F1204294;DOM 3 | | MAR MLS #H897777;DOM 3 | | MAR MLS #A1674300;DOM 73 | |
| Verification Source(s) | | BCPA.NET/REALIST | | BCPA.NET/REALIST | | BCPA.NET/REALIST | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment | DESCRIPTION | +(-)$ Adjustment |
| Sale or Financing | | CONV | | FHA | | PENDING | |
| Concessions | | NONE NOTED | | NONE NOTED | | | |
| Date of Sale/Time | | 11/02/2012 | | 06/25/2012 | | PENDING SALE | |
| Location | SUBURBAN | SUBURBAN | | SUBURBAN | | SUBURBAN | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 5042 sf | 11549 sf | -32,500 | 7556 sf | -12,500 | 3999 sf | 6,000 |
| View | RESIDENTIAL | RESIDENTIAL | | RESIDENTIAL | | RESIDENTIAL | |
| Design (Style) | 2 STORY | RANCH | | RANCH | | 2 STORY | |
| Quality of Construction | CBS/AVG | CBS/AVG | | CBS/AVG | | CBS/AVG | |
| Actual Age | 18 | 31 | | 27 | | 23 | |
| Condition | AVG/GOOD | AVG/GOOD | | GOOD | -20,000 | AVG/GOOD | |
| Above Grade | Total Bdrms Baths | Total Bdrms Baths | | Total Bdrms Baths | | Total Bdrms Baths | |
| Room Count | 7 3 2.5 | 7 3 2.0 | 2,500 | 7 3 2.0 | 2,500 | 7 3 2.5 | |
| Gross Living Area | 1,690 sq. ft. | 1,655 sq. ft. | 0 | 1,563 sq. ft. | 5,080 | 1,558 sq. ft. | 5,280 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | CENTRAL A/C | CENTRAL A/C | | CENTRAL A/C | | CENTRAL A/C | |
| Energy Efficient Items | NONE | NONE | | NONE | | NONE | |
| Garage/Carport | GARAGE: 2 | GARAGE: 2 | | GARAGE: 2 | | GARAGE: 1 | 5,000 |
| Porch/Patio/Deck | PORCH/PATIO | PORCH/PATIO | | PORCH/PATIO | | PORCH/PATIO | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | □ + ☒ - | $ 30,000 | □ + ☒ - | $ 24,920 | ☒ + □ - | $ 15,280 |
| Adjusted Sale Price | | Net Adj. -13.4% | | Net Adj. -11.9% | | Net Adj. 6.6% | |
| of Comparables | | Gross Adj. 15.6% $ 194,500 | | Gross Adj. 19.1% $ 185,080 | | Gross Adj. 6.6% $ 247,280 | |
| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
| Date of Prior Sale/Transfer | | | | 03/21/2012 | | | |
| Price of Prior Sale/Transfer | | | | 140900 (CERT. OF TITLE) | | | |
| Data Source(s) | REALIST/IMAPP | REALIST/IMAPP | | REALIST/IMAPP | | REALIST/IMAPP | |
| Effective Date of Data Source(s) | 11/06/2012 | 11/06/2012 | | 11/06/2012 | | 11/06/2012 | |

Summary of Sales Comparison Approach  COMPARABLE SALE #4, 5, PENDING SALE #6 & ACTIVE LISTING #7 WERE INCLUDED FOR
ADDITIONAL SUPPORT.

Freddie Mac Form 70 March 2005                    Produced using ACI software, 800.234.8727 www.aciweb.com                    Fannie Mae Form 1004 March 2005
INID 05/05/2005

A & F APPRAISAL SERVICES

## Uniform Residential Appraisal Report

File No. AM5505

| FEATURE | SUBJECT | COMPARABLE SALE NO. 7 | | COMPARABLE SALE NO. 8 | | COMPARABLE SALE NO. 9 | |
|---|---|---|---|---|---|---|---|
| Address | 321 SW 9B AVE | 9831 SW 3 ST | | | | | |
| | PEMBROKE PINES, FL 33025 | PEMBROKE PINES, FL 33025 | | | | | |
| Proximity to Subject | | 0.05 miles ENE | | | | | |
| Sale Price | $ | $ 185,000 | | $ | | $ | |
| Sale Price/Gross Liv Area | $ 0.00 sq. ft. | $ 109.08 sq. ft. | | $ sq. ft. | | $ 0.00 sq. ft. | |
| Data Source(s) | | MAR MLS #A1685917;DOM 63 | | | | | |
| Verification Source(s) | | BCPA.NET/REALIST | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ACTIVE | | | | | |
| Concessions | | | | | | | |
| Date of Sale/Time | | ACTIVE | -9,000 | | | | |
| Location | SUBURBAN | SUBURBAN | | | | | |
| Leasehold/Fee Simple | FEE SIMPLE | FEE SIMPLE | | | | | |
| Site | 5042 sf | 4031 sf | 5,000 | | | | |
| View | RESIDENTIAL | RESIDENTIAL | | | | | |
| Design (Style) | 2 STORY | 2 STORY | | | | | |
| Quality of Construction | CBS/AVG | CBS/AVG | | | | | |
| Actual Age | 18 | 18 | | | | | |
| Condition | AVG/GOOD | AVG/GOOD | | | | | |
| Above Grade | Total | Bdrms | Baths | Total | Bdrms | Baths | Total | Bdrms | Baths | | Total | Bdrms | Baths | | Total | Bdrms | Baths | |
| Room Count | 7 | 3 | 2.5 | 7 | 3 | 2.5 | | | | |
| Gross Living Area | 1,690 sq. ft. | 1,696 sq. ft. | 0 | sq. ft. | | sq. ft. | |
| Basement & Finished | 0sf | 0sf | | | | | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | AVERAGE | AVERAGE | | | | | |
| Heating/Cooling | CENTRAL A/C | CENTRAL A/C | | | | | |
| Energy Efficient Items | NONE | NONE | | | | | |
| Garage/Carport | GARAGE: 2 | GARAGE: 2 | | | | | |
| Porch/Patio/Deck | PORCH/PATIO | PORCH/PATIO | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Net Adjustment (Total) | | [ ] + [X] - | $ 4,000 | [X] + [ ] - | $ 0 | [X] + [ ] - | $ 0 |
| Adjusted Sale Price | | Net Adj -2.2% | | Net Adj 0.0% | | Net Adj 0.0% | |
| of Comparables | | Gross Adj 7.6% | $ 181,000 | Gross Adj 0.0% | $ 0 | Gross Adj 0.0% | $ 0 |

| ITEM | SUBJECT | COMPARABLE SALE NO. 7 | COMPARABLE SALE NO. 8 | COMPARABLE SALE NO. 9 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | | | | |
| Price of Prior Sale/Transfer | | | | |
| Data Source(s) | REALIST/IMAPP | REALIST/IMAPP | | |
| Effective Date of Data Source(s) | 11/06/2012 | 11/06/2012 | | |

Summary of Sales Comparison Approach

| Borrower: N/A | | File No.: AM5505 | |
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |

**BEGINNING ADDENDUM**
THIS IS A SUMMARY APPRAISAL REPORT WHICH IS INTENDED TO COMPLY WITH THE REPORTING REQUIREMENTS
SET FORTH UNDER STANDARDS RULE 2-2 (B) OF THE UNIFORM STANDARD OF PROFESSIONAL APPRAISAL PRACTICE
FOR A SUMMARY APPRAISAL REPORT. AS SUCH, IT PRESENTS ONLY SUMMARY DISCUSSIONS OF THE DATA,
REASONING AND ANALYSES THAT WERE USED IN THE APPRAISAL PROCESS TO DEVELOP THE APPRAISER'S
OPINION OF VALUE. SUPPORTING DOCUMENTATION THAT IS NOT PROVIDED WITH THE REPORT CONCERNING THE
DATA, REASONING AND DISCUSSION CONTAINED IN THIS REPORT IS SPECIFIC TO THE NEEDS OF THE CLIENT AND
FOR THE INTENDED USE STATED IN THE REPORT. THE APPRAISER IS NOT RESPONSIBLE FOR UNAUTHORIZED USE
OF THIS REPORT.

**DIGITAL SIGNATURE**
*IT SHOULD BE NOTED THAT THE SIGNATURE WILL ONLY BE DISPLAYED AND INSERTED BY THE SUPERVISORY
APPRAISER. ONCE THE REPORT IS SIGNED, IT CANNOT BE EDITED UNLESS THE SUPERVISORY APPRAISER REMOVES
IT. THE SIGNATURE OF THE REGISTERED ASSISTANT REAL ESTATE APPRAISER AND THE CERTIFIED REAL ESTATE
APPRAISER ARE PASSWORD PROTECTED.

**PURPOSE OF APPRAISAL**
THE PURPOSE OF THIS REPORT IS TO ESTIMATE THE MARKET VALUE OF THE SUBJECT PROPERTY AS OF THE DATE
INDICATED.

**SCOPE OF THE APPRAISAL**
THE "SCOPE OF THE APPRAISAL" MEANS THE EXTENT OF THE PROCESS OF COLLECTING, CONFIRMING AND
REPORTING DATA PERTINENT TO THE FORMATION OF A MARKET VALUE ESTIMATE FOR THE SUBJECT PROPERTY.
THE APPRAISAL IS BASED ON THE INFORMATION GATHERED BY THE APPRAISER FROM PUBLIC RECORDS, OTHER
IDENTIFIED SOURCES, INSPECTION OF THE SUBJECT PROPERTY AND NEIGHBORHOOD, AND SELECTION OF
COMPARABLE SALES WITHIN THE SUBJECT MARKET AREA. THE ORIGINAL SOURCE OF THE COMPARABLES ARE
SHOWN IN THE DATA SOURCE SECTION OF THE MARKET GRID, ALONG WITH SOURCES OF CONFIRMATION. IF
AVAILABLE. WHEN CONFLICTING INFORMATION WAS PROVIDED, THE SOURCE DEEMED MOST RELIABLE WAS
USED. DATA BELIEVED UNRELIABLE WAS NOT INCLUDED IN THE REPORT, NOR USED AS A BASIS FOR THE VALUE
CONCLUSION. ALL OF THE RELEVANT ASPECTS OF THE VERIFIED DATA RELIED UPON, AS KNOWN TO THE
APPRAISER, IS REPORTED WITHIN THIS REPORT. DESCRIPTIVE FACTORS AND A DISCUSSION OF THE DATA ARE
INCLUDED WITHIN THE APPROPRIATE SECTIONS OF THIS REPORT.

**HIGHEST AND BEST USE**
HIGHEST AND BEST USE: THE REASONABLE PROBABLE AND LEGAL USE OF VACANT LAND OR IMPROVED
PROPERTY, WHICH IS PHYSICALLY POSSIBLE, APPROPRIATELY SUPPORTED, FINANCIALLY FEASIBLE, AND THAT
RESULTS IN THE HIGHEST VALUE. THE FOUR CRITERIA THE HIGHEST AND BEST USE MUST MEET ARE LEGAL
PERMISSIBILITY, PHYSICAL POSSIBILITY, FINANCIAL FEASIBILITY, AND MAXIMUM PROFITABILITY.

HIGHEST AND BEST USE OF LAND OR SITE AS THOUGH VACANT. THE USE OF A PROPERTY BASED ON THE
ASSUMPTION THAT A PARCEL OF LAND IS VACANT OR CAN BE MADE VACANT THROUGH DEMOLITION OF ANY
IMPROVEMENTS.

HIGHEST AND BEST USE OF PROPERTY AS IMPROVED, THE USE THAT SHOULD BE MADE OF A PROPERTY AS IT
EXISTS.

THE OPINION OF HIGHEST AND BEST INDICATED IN THIS REPORT TAKES INTO ACCOUNT THESE FACTORS AND THE
NATURE OF THE SUBJECT PROPERTY AS IT COMPARES WITH THE SURROUNDING NEIGHBORHOOD.

**CONDITION OF COMPONENTS**
THE APPRAISAL CALLS FOR OPINIONS OF CONDITION ON CERTAIN COMPONENTS OF THE SUBJECT IMPROVEMENTS
INCLUDING, BUT NOT LIMITED TO; APPLIANCES, HEATING/COOLING, SURFACES, ELECTRICAL, MECHANICAL, ROOF,
AND PLUMBING SYSTEMS. THE CONDITIONS INDICATED IN THIS REPORT ARE BASED ON OBSERVATIONS MADE AT
THE TIME OF INSPECTION. THEY RELY ON REASONABLE EXPECTATIONS AS TO ADEQUACY AS WELL AS VISUAL
INDICATIONS; AND ARE BASED UPON NEIGHBORHOOD STANDARDS. THE OBSERVATIONS DO NOT CONSTITUTE
CERTIFICATIONS; AND IF CERTIFICATION IS REQUIRED A LEGALLY QUALIFIED CONSULTANT SHOULD BE
RETAINED.

**ZONING AND BUILDING COMPLIANCE**
THE OPINION OF ZONING COMPLIANCE EXPRESSED IN THIS REPORT IS BASED ON INSPECTION OF THE PROPERTY,
AND GENERALLY AVAILABLE INFORMATION WITH RESPECT TO THE ASSIGNED ZONING CLASSIFICATION, AND
DOES NOT REPRESENT A CERTIFICATION OF COMPLIANCE. THIS REPORT ALSO ASSUMES THAT THE PROPERTY AS
INSPECTED WAS BUILT IN COMPLIANCE WITH ALL APPLICABLE CODES, REGULATIONS AND THAT ALL NECESSARY
PERMITS WERE OBTAINED.

**ENVIRONMENTAL**
UNLESS OTHERWISE STATED IN THIS REPORT, THE EXISTENCE OF HAZARDOUS MATERIAL, STORAGE ITEMS,
CONTAINERS, OR MATERIAL THAT ARE NOT INTENDED FOR NORMAL AND AVERAGE CONSUMER USAGE AROUND
THE HOME, WHICH MAY OR MAY NOT BE PRESENT ON THE PROPERTY, WAS NOT OBSERVED BY THE APPRAISER.
THE APPRAISER HAS NO KNOWLEDGE OF THE EXISTENCE OF SUCH MATERIALS ON OR IN THE PROPERTY. THE
APPRAISER, HOWEVER, IS NOT QUALIFIED TO DETECT SUCH SUBSTANCES. THE PRESENCE OF SUBSTANCES SUCH
AS ASBESTOS, UREA-FORMALDEHYDE FOAM INSULATION, OR OTHER POTENTIALLY HAZARDOUS MATERIALS MAY
AFFECT THE VALUE OF THE PROPERTY. THE VALUE ESTIMATE IS PREDICATED ON THE ASSUMPTION THAT THERE
IS NO SUCH MATERIAL ON OR IN THE PROPERTY THAT WOULD CAUSE A LOSS IN VALUE. NO RESPONSIBILITY IS
ASSUMED FOR ANY SUCH CONDITIONS OR FOR ANY EXPERTISE OR ENGINEERING KNOWLEDGE REQUIRED TO
DISCOVER THEM. THE CLIENT IS URGED TO RETAIN AN EXPERT IN THIS FIELD, IF DESIRED.

| Borrower: N/A | | File No.: AM5505 | |
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |

**FLOOD ZONE**
THE FLOOD ZONE INDICATED ON THIS REPORT WAS OBTAINED FROM FLOOD INSURANCE RATE MAPS (FIRM), ISSUED BY THE FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA). THE ZONE INDICATED IN THE YES/NO SPACE ON THE FIRST PAGE OF THIS REPORT REFERS TO WHETHER OR NOT THE SUBJECT PROPERTY LIES IN A FEMA OR HUD DEFINED FLOOD HAZARD AREA. IT DOES NOT REFER TO FLOOD INSURANCE REQUIREMENTS, WHICH ARE SET BY POLICY OF LENDERS AND PARTICIPANTS IN THE MORTGAGE MARKETS.

OCCASIONALLY, A PROPERTY WILL BE LOCATED ON OR NEAR A FLOOD ZONE BOUNDARY LINE MAKING IT DIFFICULT TO DETERMINE THE EXACT ZONE, GIVEN THE LIMITED DETAIL OF THE FIRM MAPS. IN THESE INSTANCES THE MOST HAZARDOUS ZONE WILL BE INDICATED ON THE REPORT. FINAL VERIFICATION OF THE ZONE SHOULD BE MADE BY ENGINEERING SURVEY.

**PERSONAL PROPERTY**
PERSONAL PROPERTY, INCLUDING THOSE ITEMS WHICH ARE NOT PERMANENTLY ATTACHED/AFFIXED TO THE REAL PROPERTY, HAVE NOT BEEN INCLUDED IN THE ESTIMATE OF VALUE UNLESS OTHERWISE INDICATED. EXAMPLES OF THE AFOREMENTIONED INCLUDE ABOVE GROUND POOLS, COUNTER TOP MICROWAVES OVENS, MOVEABLE DISHWASHERS, FURNITURE, ETC

**SUBJECT SKETCH**
THE APPRAISER IS NOT A SURVEYOR; THEREFORE THE DIMENSIONS ARE APPROXIMATE AND THE DIAGRAM IS FOR VISUAL AID ONLY.

**SQUARE FOOTAGE - COMPARABLE SALES**
THE APPRAISER USES ACTUAL LIVING AREA IN THE MARKET ANALYSIS FOR THE SUBJECT AND THE COMPARABLE SALE PROPERTIES. THE LIVING AREA UTILIZED FOR THE COMPARABLE SALES HAS BEEN OBTAINED FROM THE PUBLIC RECORDS/TAX ROLLS AND MAY HAVE BEEN FURTHER MODIFIED BY THE FIELD APPRAISER'S OBSERVATION OF THE ACTUAL IMPROVEMENTS.

THE LIVING AREA OF THE COMPARABLE SALES HAS BEEN ESTIMATED TO THE BEST OF THE APPRAISER'S OBSERVATIONS AND INFORMATION OBTAINABLE. HOWEVER, THE APPRAISER HAS NOT MEASURED THE SALE PROPERTIES OR HAD BENEFIT OF SURVEYS, UNLESS OTHERWISE NOTED.

**TAXES/LEGAL DESCRIPTION**
THIS INFORMATION HAS BEEN DERIVED THROUGH PUBLIC RECORD SOURCES/TAX ROLLS AS PROVIDED BY ISCNET TO OUR OFFICE.

**COST APPROACH**
THE REPLACEMENT COSTS UTILIZED WITHIN THIS APPRAISAL ARE OBTAINED FROM THE "MARSHALL & SWIFT COST HANDBOOK" AND ROUNDED. THE APPROPRIATE COST ADJUSTMENTS WERE MADE FOR SIZE AND STYLE OF THE IMPROVEMENTS. THESE COST FIGURES ARE FREQUENTLY COMPARED TO ACTUAL CONSTRUCTION COSTS SUPPLIED BY LOCAL BUILDERS.

THE SITE VALUE WAS BASED UPON RECENT SALES OF COMPARABLE SITES IN THE SUBJECT'S GENERAL NEIGHBORHOOD OR COMPETING NEIGHBORHOODS. IF NO LAND SALES WERE AVAILABLE, THE SITE VALUE WAS ABSTRACTED FROM IMPROVED SALES FROM WITHIN THE SUBJECT'S IMMEDIATE AREA.

IF THE SUBJECT PROPERTY IS A CONDOMINIUM UNIT, THE COST APPROACH IS NOT CONSIDERED APPROPRIATE AND THEREFORE WAS NOT UTILIZED IN THIS REPORT.

**MARKET APPROACH**
THE ADJUSTMENTS FOR SALES/FINANCING CONCESSIONS ARE NOT NECESSARILY THE STATED VALUE OF THE CONCESSIONS, BUT RATHER THE MARKET-INDICATED IMPACT OF SUCH CONCESSIONS. WHENEVER POSSIBLE, FINANCIAL CONSIDERATIONS HAVE BEEN VERIFIED BY BUYER, SELLER OR SALES AGENT.

IT IS THE APPRAISER'S OPINION THAT THE COMPARABLE SALES UTILIZED ARE THE MOST REFLECTIVE OF THE MARKET FOR THE SUBJECT PROPERTY.

**RECONCILIATION**
EACH APPROACH DEMONSTRATED IS CONSIDERED TO BE A REFLECTION OF MARKET BEHAVIOR. THE FINAL RELIANCE IS PLACED UPON THE MARKET APPROACH TO VALUE BECAUSE OF THE RELIABILITY AND AVAILABILITY OF MARKET DATA. IN ADDITION, IT IS MOST REFLECTIVE OF BUYERS AND SELLERS ATTITUDES WITHIN THE LOCAL MARKET. THE COST APPROACH IS CONSIDERED A SUPPORTIVE INDICATOR OF VALUE.
**Legal Description**
TANGLEWOOD TOWNHOMES 117-43 B A PORTION TRACT"A"DESC'D AS:COMM SW COR SAID TR"A",N 520.37, E 858.01,S 238.16 TO POB,W 91.46 SE 43.28,SELY 35.74,E 53.36, N 81.85 TO POB AKA: LOT 63 OF THE GARDENLAKE

**NEIGHBORHOOD MARKET CONDITIONS**
TYPICAL FINANCING IN THE SUBJECT'S MARKET AREA INCLUDES CONVENTIONAL LOANS, FHA, VA WITH SOME SELLER FINANCING. PROPERTY VALUES ARE STABLE IN THE SUBJECT'S MARKET. DEMAND AND SUPPLY ARE IN BALANCE AND TYPICAL MARKETING TIME IS AVERAGING AT 3-6 MONTHS.
DURING THE PAST FEW YEARS, PROPERTY VALUES IN SOUTH FLORIDA HAVE BEEN DECLINING AND LEVELING OFF. THIS TREND HAS OCCURED THROUGHOUT THE UNITED STATES AND IN MANY CITIES PROPERTIES ARE EXPERIENCING A CORRECTION OF VALUES. PROPERTY VALUES HAD ESCALATED AT TOO HIGH OF A PACE FROM 2000 TO 2006 AND REAL ESTATE GAINS WERE BEYOND EXPECTATIONS. PROPERTY VALUES HAVE STABALIZED IN THE SUBJECT'S NEIGHBORHOOD. HOMES IN THE AREA ARE SELLING FOR APPROXIMATELY 95% OF THEIR LIST

| Borrower: N/A | | File No.: AM5505 |
|---|---|---|
| Property Address: 321 SW 99 AVE | | Case No.: |
| City: PEMBROKE PINES | State: FL | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | |

PRICES.

| | | |
|---|---|---|
| Borrower: N/A | File No.: AM5505 | |
| Property Address: 321 SW 99 AVE | Case No.: | |
| City: PEMBROKE PINES | State: FL | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | |



FRONT VIEW OF
SUBJECT PROPERTY

Appraised Date: November 6, 2012
Appraised Value: $ 170,000



REAR VIEW OF
SUBJECT PROPERTY



STREET SCENE

| Borrower: N/A | | File No.: AM5505 | |
|---|---|---|---|
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |



**Kitchen**

Comment:



**Living Area**

Description:

Comment:



**Bathroom**

Description:
HALF BATH

Comment:

| Borrower: N/A | | File No.: AM5505 | |
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |



BATHROOM

Comment:



BATHROOM

Comment:

Comment:

| Borrower: N/A | | File No.: AM5506 | |
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |



Bedroom

Comment:



Bedroom

Comment:



Bedroom

Comment:

| | | | |
|---|---|---|---|
| Borrower: N/A | | File No.: AM5505 | |
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |



**COMPARABLE SALE #1**

250 SW 98 TERR
PEMBROKE PINES, FL 33025
Sale Date: 09/18/2012
Sale Price: $ 185,000



**COMPARABLE SALE #2**

9840 SW 3 ST
PEMBROKE PINES, FL 33025
Sale Date: 08/29/2012
Sale Price: $ 195,700



**COMPARABLE SALE #3**

300 SW 100 AVE
PEMBROKE PINES, FL 33025
Sale Date: 10/16/2012
Sale Price: $ 162,500

| Borrower: N/A | | | |
|---|---|---|---|
| Property Address: 321 SW 99 AVE | | File No.: AM5505 | |
| City: PEMBROKE PINES | State: FL | Case No.: | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |



COMPARABLE SALE #4

9570 SW 7 CT
PEMBROKE PINES, FL 33025
Sale Date: 11/02/2012
Sale Price: $ 224,500



COMPARABLE SALE #5

820 SW 95 TERR
PEMBROKE PINES, FL 33025
Sale Date: 06/25/2012
Sale Price: $ 210,000



COMPARABLE SALE #6

311 SW 100 TERR
PEMBROKE PINES, FL 33025
Sale Date: PENDING SALE
Sale Price: $ 232,000

| | |
|---|---|
| Borrower: N/A | File No.: AM5505 |
| Property Address: 321 SW 99 AVE | Case No.: |
| City: PEMBROKE PINES | State: FL Zip: 33025 |
| Lender: FRANCIS GRIFFITH | |



COMPARABLE SALE #7

9831 SW 3 ST
PEMBROKE PINES, FL 33025
Sale Date: ACTIVE
Sale Price: $ 185,000

FLOORPLAN SKETCH

| Borrower: N/A | | File No.: AM5505 | |
|---|---|---|---|
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |



Comments:

| AREA CALCULATIONS SUMMARY | | | | | LIVING AREA BREAKDOWN | | |
|---|---|---|---|---|---|---|---|
| Code | Description | Size | Net Totals | | Breakdown | | Subtotals |
| GLA1 | First Floor | 810.00 | 810.00 | | First Floor | | |
| GLA2 | Second Floor | 880.00 | 880.00 | | 6.0 x | 32.0 | 192.00 |
| GAR | Garage | 400.00 | 400.00 | | 10.0 x | 30.0 | 300.00 |
| | | | | | 12.0 x | 20.0 | 240.00 |
| | | | | | 6.0 x | 13.0 | 78.00 |
| | | | | | Second Floor | | |
| | | | | | 20.0 x | 32.0 | 640.00 |
| | | | | | 15.0 x | 16.0 | 240.00 |
| TOTAL LIVABLE | (rounded) | | 1690 | | 6 Calculations Total (rounded) | | 1690 |

PLAT MAP

| Borrower: N/A | | File No.: AM5506 | |
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |



LOCATION MAP

| Borrower: N/A | | File No.: AM5505 | |
| Property Address: 321 SW 99 AVE | | Case No.: | |
| City: PEMBROKE PINES | State: FL | | Zip: 33025 |
| Lender: FRANCIS GRIFFITH | | | |





**STATE OF FLORIDA**

DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION

FLORIDA REAL ESTATE APPRAISAL BD          850-487-1395
1940 N. MONROE ST.
TALLAHASSEE          FL 32399-0783


MELTZER, ANDREW S
3550 BISCAYNE BLVD #312
MIAMI          FL 33137


Congratulations!  With this license you become one of the nearly one million Floridians licensed by the Department of Business and Professional Regulation. Our professionals and businesses range from architects to yacht brokers, from boxers to barbeque restaurants, and they keep Florida's economy strong.

Every day we work to improve the way we do business in order to serve you better. For information about our services, please log onto www.myfloridalicense.com. There you can find more information about our divisions and the regulations that impact you, subscribe to department newsletters and learn more about the Department's initiatives.

Our mission at the Department is: License Efficiently, Regulate Fairly. We constantly strive to serve you better so that you can serve your customers. Thank you for doing business in Florida, and congratulations on your new license!



AC# 6465102
STATE OF FLORIDA
DEPARTMENT OF BUSINESS AND
PROFESSIONAL REGULATION
RD3190          10/16/12   128122938
CERTIFIED RESIDENTIAL APPRAISER
MELTZER, ANDREW S

IS CERTIFIED under the provisions of Ch.475 FS
Expiration date: NOV 30, 2014          L12101603116

---

DETACH HERE

THIS DOCUMENT HAS A COLORED BACKGROUND • MICROPRINTING • LINEMARK™ PATENTED PAPER

AC# 6465102                    **STATE OF FLORIDA**
                    DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
                    FLORIDA REAL ESTATE APPRAISAL BD
                                        SEQ#L12101603116

| DATE | BATCH NUMBER | LICENSE NBR |
|------|--------------|-------------|
| 10/16/2012 | 128122938 | RD3190 |

The CERTIFIED RESIDENTIAL APPRAISER
Named below IS CERTIFIED
Under the provisions of Chapter 475 FS.
Expiration date: NOV 30, 2014

MELTZER, ANDREW S
3550 BISCAYNE BLVD #312
MIAMI          FL 33137


RICK SCOTT                                        KEN LAWSON
GOVERNOR          DISPLAY AS REQUIRED BY LAW          SECRETARY



## COVER NOTE

**INSURED: Andrew Meltzer**

MAILING ADDRESS: 3550 Biscayne Blvd #312
                 Miami, FL 33137

*This is to certify that the undersigned has procured insurance coverage as hereafter specified from
certain companies and/or underwriters.*

**EFFECTIVE: 10/20/2012    EXPIRATION: 10/20/2013    RETROACTIVE: 10/20/1999**

COVERAGE: FREA Errors & Omissions Professional Liability Policy

Profession: Real Estate Appraiser
Claims Made Form: 90395 (3/06)
Limits: Per Occurrence: $1,000,000   Annual Aggregate: $1,000,000
$1,000 Retention each wrongful act

CONDITIONS:

Real Estate Agent/ Broker Referral Indemnity
Known wrongful act exclusion
Pending/prior litigation exclusion
Defense within policy limit

**COMPANIES PARTICIPATING:**
National Union Fire Insurance Company of Pittsburgh, PA

**COVER NOTE # Z FREA *01-1476***
**CUSTOMER # 0014746**

Issued at: 4907 Morena Blvd., Suite 1415
           San Diego, CA 92117

**DATE: 10/12/2012**                           By:
Insurance, when effected shall be subject to all terms and conditions of policy(ies) which will be
issued, and in the event of any inconsistency herewith, the terms and provisions of the policy
prevail.

EXHIBIT "C"

*N*

This Instrument Prepared By: *C. Thomas*
DIVERSIFIED MORTGAGE
26133 US HWY. 19 N., SUITE 400
CLEARWATER, FLORIDA 33763

After Recording Return To:
Loan Number: 1051806

**RETURN TO:**
**YOUR TITLE CHOICE, INC.**
**6261 NW 6TH WAY, SUITE 201**
**FORT LAUDERDALE, FLORIDA 33309**

——————————— [Space Above This Line For Recording Data] ———————

# MORTGAGE

MIN: 1002093-0511004637-2

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11,
13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated DECEMBER 5, 2005 , together
with all Riders to this document.
(B) "Borrower" is FRANCIS GRIFFITH, A SINGLE MAN

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security
Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number
of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is DIVERSIFIED MORTGAGE

Lender is a FLORIDA CORPORATION organized
and existing under the laws of FLORIDA
Lender's address is 26133 US HWY. 19 N. SUITE 400, CLEARWATER, FLORIDA
33763

(E) "Note" means the promissory note signed by Borrower and dated DECEMBER 5, 2005
The Note states that Borrower owes Lender TWO HUNDRED SEVENTY-SIX THOUSAND AND
00/100 Dollars (U.S. $ 276,000.00 ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
JANUARY 1, 2036 .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01
Page 1 **YOUR TITLE CHOICE, INC**
**WILL CALL**
**BOX #129**
*DocMagic* 800-649-1362
www.docmagic.com

Fl3010.mzm 1.tem

(G)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider     ☐ Condominium Rider                ☐ Second Home Rider
☐ Balloon Rider             ☒ Planned Unit Development Rider    ☒ Other(s) [specify]
☐ 1-4 Family Rider          ☐ Biweekly Payment Rider            PREPAYMENT RIDER TO
                                                                SECURITY INST

(I)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)  "Escrow Items" means those items that are described in Section 3.

(M)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

Fl3010 mzm.2.tem

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
COUNTY    of    BROWARD

[Type of Recording Jurisdiction]                [Name of Recording Jurisdiction]

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".
A.P.N. #: 51-41-17-24-0630

which currently has the address of   321 SW 99TH AVENUE

[Street]

PEMBROKE PINES                    , Florida      33025-1066      ("Property Address"):
[City]                                        [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01                              Page 3 of 15                     DocMagic ℰℱℴⱤⱮⱾ 800-649-1362
                                                                            www.docmagic.com

Fl3010.mzm.3.tem

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3010 1/01
Page 5 of 16

*DocMagic ☎EFImmm* 800-649-1362
www.docmagic.com

Fl3010.mtrm.5.tem

of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower.

FL3010.mzm.6.tem

If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.  **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

F3010.mtm.7.tem

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate

Fl3010.nbm.9.tem

as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other

means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance

or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property.  If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.**  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.**  Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs.  Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.**  As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.**  The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
FRANCIS GRIFFITH        -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                -Borrower

Signed, sealed and delivered in the presence of:

_____                 _____
Witness                                 Witness

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing instrument was acknowledged before me this 5th day of DECEMBER, 2005 by FRANCIS GRIFFITH, A SINGLE MAN

who is personally known to me or who has produced *FLORIDA DRIVERS LICENSE* as identification.                                                    (Type of Identification)

_____
Signature

B. PAULETTE HILSMAN
_____
Name of Notary

CLOSER
_____
Title

B. Paulette Hilsman
Commission #DD312376
Expires: Apr 20, 2008
Bonded Thru
(Seal)   Atlantic Bonding Co., Inc.

_____
Serial Number, if any

Fl3010.mzm.15.tem

Lot 63, of GARDEN LAKE AT PEMBROKE PINES, also known as that part of Tract "A" of TANGLEWOOD TOWNHOUSES, as recorded in Plat Book 117, at Page 43, of the Public Records of Broward County, Florida, more particularly described as follows:

Commence at the Southwest corner of said Tract "A", thence North 00° 01' 13" East along the West line of said Tract and Easterly line of Palm Avenue as shown on said Plat for 520.37 feet to the Northwest corner of said Tract; thence North 89° 53' 38" East along the North line of said tract for 858.01 feet; thence South 00° 06' 20" East for 236.16 feet to the Point of Beginning; thence South 89° 53' 40" West for 91.46 feet; thence South 15° 37' 49" East for 43.28 feet to the Point of Tangency; thence along a circular curve concave to the Northeast having for its elements a delta angle of 74° 28' 12" a radius of 27.50 feet, for an arc distance of 35.74 feet; thence North 89° 53' 40" East for 53.38 feet; thence North 00° 06' 20" West for 61.85 feet to the Point of Beginning.

# PREPAYMENT RIDER

Loan Number:  1051806

Date:  DECEMBER 5, 2005

Borrower(s):  FRANCIS GRIFFITH

THIS PREPAYMENT RIDER (the "Rider") is made this 5th  day of  DECEMBER   ,
2005                    , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of
DIVERSIFIED MORTGAGE

("Lender"). The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at

321 SW 99TH AVENUE, PEMBROKE PINES, FLORIDA 33025-1066
[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.    PREPAYMENT CHARGE
The Note provides for the payment of a prepayment charge as follows:

### 4   . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE
I have the right to make payments of Principal at any time before they are due.
A payment of Principal only is known as a "Prepayment." When I make a Prepayment,
I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.
The Note Holder will use my Prepayments to reduce the amount of Principal that
I owe under the Note. However, the Note Holder may apply my Prepayment to the
accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be
no changes in the due dates of my monthly payment unless the Note Holder agrees in
writing to those changes.
If the Note contains provisions for a variable interest rate, my partial Prepayment
may reduce the amount of my monthly payments after the first Change Date following my
partial Prepayment. However, any reduction due to my partial Prepayment may be offset
by an interest rate increase. If this Note provides for a variable interest rate or finance
charge, and the interest rate or finance charge at any time exceeds the legal limit under
which a Prepayment penalty is allowed, then the Note Holder's right to assess a
Prepayment penalty will be determined under applicable law.

If within THIRTY-SIX ( 36 ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to SIX ( 6 ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

Notwithstanding the foregoing provisions, I may make a full Prepayment without paying a Prepayment charge in connection with a bona fide and arms-length sale of all or any part of, or any legal or beneficial interest in, the Property after the first 6 months of the term of the Note. The phrase "bona fide and arms-length sale" means a sale in which all of the parties involved in the transaction, including without limitation, the buyer, seller, lender, real estate agent or broker, are independent of one another and unrelated by familial or financial interests. I agree to provide the Note Holder with any and all evidence reasonably requested by the Note Holder to substantiate that the sale of the Property is bona fide and arms-length.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

_____ (Seal)          _____ (Seal)
FRANCIS GRIFFITH        -Borrower                                   -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                   -Borrower


_____ (Seal)          _____ (Seal)
                        -Borrower                                   -Borrower

MULTISTATE PREPAYMENT RIDER - SPP
6/03                          Page 2 of 2              DocMagic *EFarms* 800-649-1362
                                                           www.docmagic.com

Uspm.ppf.2.4rm

Loan Number: 1051806

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 5th day of DECEMBER, 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to DIVERSIFIED MORTGAGE
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

321 SW 99TH AVENUE, PEMBROKE PINES, FLORIDA 33025-1066
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

COVENANTS, CONDITIONS AND RESTRICTIONS OF RECORD

(the "Declaration"). The Property is a part of a planned unit development known as

TANGLEWOOD TOWNHOMES
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                              Page 1 of 3

*DocMagic* *eFarms* 800-649-1362
www.docmagic.com

Us3150.rid 1.tem

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01          Page 2 of 3

*DocMagic ℰℱℴℛℳℴ* 800-649-1362
www.docmagic.com

Us3150.rid.2.tem

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)        _____ (Seal)
FRANCIS GRIFFITH                -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                               -Borrower                                        -Borrower

_____ (Seal)        _____ (Seal)
                               -Borrower                                        -Borrower

MULTISTATE PUD RIDER--Single Family
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01                              Page 3 of 3

DocMagic *eForms* 800-649-1362
www.docmagic.com

Us3150.rid.3.ltea

This space is for recording purposes only

Prepared by:
Record &Return to:  DAVID J STERN, ESQ.
900 South Pine Island Road Suite 400
Plantation, FL 33324-3920
09-46621 A9CF

## ASSIGNMENT OF MORTGAGE

### KNOW ALL MEN BY THESE PRESENTS:

**THAT** MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

Residing or located at c/o WELLS FARGO BANK, N.A., 3476 STATEVIEW BLVD., FT. MILL, SC 29715 herein designated as the assignor, for and in consideration of the sum of $1.00 Dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR CSMC MORTGAGE-BACKED PASS-THROUGH CERTIFICATES, SERIES 2006-3 residing or located at: C/O AMERICA'S SERVICING COMPANY, 3476 STATEVIEW BLVD., FT. MILL, SC 29715 herein designated as the assignee, the mortgage executed by FRANCIS GRIFFITH, A SINGLE MAN recorded in BROWARD County, Florida at book 41091 and page 1709 encumbering the property more particularly described as follows:

LOT 63, OF GARDEN LAKE AT PEMBROKE PINES, ALSO KNOWN AS THAT PART OF TRACT "A" OF TANGLEWOOD TOWNHOUSES, AS RECORDED IN PLAT BOOK 117, AT PAGE 43, OF THE PUBLIC RECORDS OF BROWARD COUNTY, FLORIDA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE AT THE SOUTHWEST CORNER OF SAID TRACT "A", THENCE NORTH 00°01'13" EAST ALONG THE WEST LINE OF SAID TRACT AND EASTERLY LINE OF PALM AVENUE AS SHOWN ON SAID PLAT FOR 520.37 FEET TO THE NORTHWEST CORNER OF SAID TRACT; THENCE NORTH 89°53'38" EAST ALONG THE NORTH LINE OF SAID TRACT FOR 858.01 FEET; THENCE SOUTH 00°06'20" EAST FOR 236.16 FEET TO THE POINT OF BEGINNING; THENCE SOUTH 89° 53'40"WEST FOR 91.48 FEET; THENCE SOUTH 15°37'49" EAST FOR 43.20 FEET TO THE POINT OF TANGENCY; THENCE ALONG A CIRCULAR CURVE CONCAVE TO THE NORTHEAST HAVING FOR ITS ELEMENTS A DELTA ANGLE OF 74°28'12" A RADIUS OF 27.50 FEET, FOR AN ARC DISTANCE OF 35.74 FEET; THENCE NORTH 89°53' 40" EAST FOR 53.38 FEET; THENCE NORTH 00°06' 20" WEST FOR 61.85 FEET TO THE POINT OF BEGINNING.

together with the note and each and every other obligation described in said mortgage and the money due and to become due thereon

TO HAVE AND TO HOLD the same unto the said assignee, its successors and assigns forever, but without recourse on the undersigned.

Pursuant to the provisions of Sec. 689.071, Florida Statutes, the within named Trustee has the power and authority to protect, conserve and to sell, or to lease, or to encumber, or otherwise to manage and dispose of the above-described mortgage and the real property encumbered thereby.

**In Witness Whereof,** the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper corporate officers and its corporate seal to be hereto affixed , this 18th day of December, 2009, but effective as of the 9th day of June, 2009.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
(CORPORATE SEAL)

ATTEST:

WITNESS:
Print Name: Camille Garcia

BY:
PRINT NAME: John Kennerty
TITLE: Assistant Secretary

WITNESS:
Print Name: Kelly S. Klawer

STATE OF SOUTH CAROLINA
COUNTY OF YORK

PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the aforesaid county and state, on this 18th day of December, 2009, within my jurisdiction, the within named John Kennerty, who is personally known to me and who acknowledged to me that (s)he is Assistant Secretary and that for and on behalf of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. and as its act and deed (s)he executed the above and foregoing instrument, after first having been duly authorized by MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. to do so.

WITNESS my hand and official seal in the County and State last aforesaid this 18th day of December, 2009.

OFFICIAL SEAL
Notary Public
State of South Carolina
GERALDINE JOHNSON
My Commission Expires Jan. 15, 2013

NOTARY PUBLIC

*PBM* *F09-46621* *D1104*